# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

FRANCESCA D'AMBRA, :
Plaintiff :
:
V. : CA NO.: 06-352S
:
NEW ENGLAND GAS COMPANY :
Defendant :

Deposition of **MARIO CARLINO**, a Witness in the above-entitled cause, taken on behalf of the Plaintiff, before Diane J. DeStefano, RPR, a Notary Public in and for the State of Rhode Island, at the Law Offices of Bernard P. Healy, 750 East Avenue, Pawtucket, Rhode Island 02860 on Thursday, November 9, 2006, scheduled for 1:00 p.m.

APPEARANCES:

FOR THE PLAINTIFF: LAW OFFICES OF BERNARD P. HEALY
BY: BERNARD P. HEALY, ESQUIRE

FOR THE DEFENDANT: NIXON PEABODY LLP
BY: NEAL J. McNAMARA, ESQUIRE

COPY

Diane J. DeStefano, RPR
15 Seabreeze Terrace
South Kingstown, R.I. 02879
401/782-4441

was decided by myself -- by Brian Hunt, the supervisors, and myself, and the -- I'm sorry.
Q. No, no. Continue.
A. And the reasoning was because we felt at this point in time she was in jeopardy, and spending time in other departments and trying to evaluate her knowledge, her physical capability and her common sense, we needed to have her spend more time in the department that she was being evaluated in.
Q. Aside from you and Brian Hunt, who were the other persons who participated and ultimately came to this decision?
A. We were in one of these meetings, one of our monthly evaluation ranking meetings.
Q. Do you recall who the other persons were at the meeting?
A. It was the supervisors.
Q. Was Mr. Ganem still a supervisor at this point?
A. He always was a supervisor.
Q. Was he in attendance at the meeting?
A. I believe so.
Q. I mean, I think you had earlier told us that Mr. Ganem took on another position and ceased to

be a mentor.
A. He ceased to be her mentor but he still participated -- he still worked in the department as a supervisor and still participated in the meetings.
MR. HEALY: We'll have this marked as Exhibit 15, please.
(Whereupon, Plaintiff's No. 15 was marked for identification.)
BY MR. HEALY:
Q. Looking at Exhibit 15, and correct me if I'm wrong, Mr. Carlino, this is a memorandum or e-mail that you sent to Fred Amaral; is that correct?
A. Correct.
Q. And this was done after Fran was terminated; is that right? If you want to refer to the last page, you mentioned termination on January 19th, 2006.
A. Well, it said that on January 19th, 2006 I met with the CFS director, manager and supervisors to discuss Fran's progress and evaluation and that based on our findings we agreed that she did not meet our expectations. I don't know when she was let go, but I -- so I -- I can't answer this

question.
Q. Okay.
A. But it was a recap of what we had done up to the 19th.
Q. And is it fair to say that one of the reasons Francesca D'Ambra was not hired was the question of her physical strength?
A. It wasn't just her physical strength.
Q. What else was it?
A. Her skill, her knowledge after five and a half months. She did not show the supervisors in the field that she had really grasped the knowledge that she should have after five and a half months.
Q. And I want to delineate the supervisors in the field. They were Brian Hunt, who was not in favor of hiring Ms. D'Ambra; is that correct?
MR. MCNAMARA: Objection.
A. I can't answer that question.
Q. Well, who were the supervisors who gave unfavorable ratings to Ms. D'Ambra?
A. At the end? Are you asking me in January?
Q. Yes.
A. Or in the beginning?
Q. At the end.

A. Okay. If you read the last page, second paragraph, "During the week of January 2nd, Bob Langlois, Larry Denofio, Brian Hunt and John Crompton evaluated Fran in the field. Each individual spent the majority of the day with Fran. All their comments on the evaluations were very similar. They feel as though with five and a half months on the job she does not demonstrate the understanding of the job, not meeting expectations, doesn't accept responsibility for her lack of understanding procedures, pushes the blame off on others instead of herself. When told to do something a certain way, she yes's you but then does it her way (example; timesheet), ignores your suggestion, doesn't seem comfortable interacting with co-workers, customers, does not receive constructive criticism well and lacks the physical ability."

Q. And this was the consensus of Robert Langlois, Lawrence Denofio, Brian Hunt and John Crompton; is that correct?

A. That's correct.

Q. And also Charlie Rugg was of the opinion that Francesca was not a good potential employee of the

gas company; is that correct?

MR. MCNAMARA: Objection.

A. Charlie Rugg spent one week with Francesca. His instructions were to teach her, make sure she understands every facet of the job. After the first two days, Charlie came to see me and says, "You know, I'm teaching her everything. I hope it's finally clicking."

The remaining three days he just -- he, in his opinion, felt that she did not have the -- she did not know why she was at a house, she did not know what a turn-on was or a shutoff. She had no concept for why she was there.

Q. So Mr. Rugg reported to you that Francesca D'Ambra had no idea what a turn-on or shutoff was?

A. His exact words were, "She doesn't know why she's doing things that she's doing." Those were his exact words.

Q. Now, did you, in fact, receive evaluations from some of those persons after Ms. D'Ambra was terminated with the gas company?

A. From the supervisors?

Q. Yes.

A. I don't remember if I did.

Q. Ultimately, who made the decision to terminate Francesca D'Ambra?
A. I would say that I presented the director of the department, Rick Enright, with the information that was provided to me from his supervisors and managers, and based on the evaluation process that we established and the requirements and attributes that we expected, that my feedback to Rick, based on a consensus and evaluations, that Francesca should not be employed at the company.
Q. Now, correct me if I'm wrong, you never observed Francesca in the field; is that correct?
A. That's correct.
Q. So, basically, your sole input came from the supervisors who attended these meetings; is that correct?
A. That's correct. And my responsibility was that when someone made comments like, "She lacked the physical ability," it's my duty -- whether said about Fran or anyone else, it was my duty to say, "What do you mean by that," to give me detail, and then to push it back on them to say, "Well, it's our responsibility to instruct her on how to do it properly." So I was the keeper of the records.

It was based on their input.
Q. Was it only the supervisors or were you also speaking to Mr. Rugg and Dave Andrews?
A. I asked them for input, but ultimately it's the supervisor's responsibility to evaluate and determine whether someone is meeting expectations or not. We can ask for input -- we did ask for input, but ultimately the decision was up to the supervisor.
Q. So these would have been, at this point in December 2005, Mr. Hunt, Mr. Coombs, Mr. Enright, Mr. Langlois, Mr. Denofio and Mr. Crompton?
A. It would be, yeah, the supervisors, managers and sometimes the director of the department that discussed it. When we asked a service tech, it was just feedback, another set of eyes.
MR. HEALY: Thank you. I have nothing further. Actually, could we take a very brief break?
(Off the record)
MR. HEALY: Just a couple of more questions.
BY MR. HEALY:
Q. Did you ever advise Francesca D'Ambra at any time